223 N.J. Super. 40 (1988)
537 A.2d 1328
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GEORGE C. HELEWA, SR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 1988.
Decided February 18, 1988.
*41 Before Judges MICHELS, SHEBELL and GAYNOR.
William J. Shipers argued the cause for appellant (Thomas J. Shamy, attorney; Mr. Shipers, of counsel and on the brief).
Diane Pincus, Assistant Middlesex County Prosecutor, argued the cause for respondent (Alan A. Rockoff, Middlesex County Prosecutor, attorney; Ms. Pincus, of counsel and on the brief).
Debra L. Stone, Deputy Attorney General, argued the cause for amicus curiae W. Cary Edwards, Attorney General (W. Cary Edwards, attorney; Ms. Stone, of counsel and on the brief).
Lorraine E. Stanley filed a brief on behalf of amicus curiae American Civil Liberties Union of New Jersey.
The opinion of the court was delivered by MICHELS, P.J.A.D.
Pursuant to leave granted by this court, defendant George C. Helewa, Sr. appeals from an order of the Law Division that *42 denied his motion to suppress his statement to a Division of Youth and Family Services (DYFS) caseworker during an interview conducted after he was arrested on charges of sexually abusing his two teenage daughters. The pivotal issue posed by this appeal is whether, in the circumstances here present, the Miranda doctrine requires a DYFS caseworker to administer Miranda warnings prior to conducting a custodial interview.[1]
The record shows that at approximately 11:00 a.m. on October 8, 1985, defendant was arrested by Detective Casey Lenning (Lenning) and several other officers of the Old Bridge Township Police Department and charged with sexually assaulting his two daughters, ages 13 and 15. Defendant was taken to the Old Bridge Police Headquarters where he was advised of his Miranda rights and given a Miranda warning card by Lenning. Defendant read and signed the card in the presence of the officers. At this time defendant did not request an attorney. He was not questioned by the officers and was not asked if he wanted to make a statement. After spending approximately five hours at Old Bridge Police Headquarters, defendant was transferred to the Middlesex County Adult Corrections Center (Corrections Center).
The following day, on October 9, 1985, while confined at the Corrections Center, defendant was interviewed for approximately one hour and 15 minutes by Ms. Joanne Miller (Miller), a DYFS caseworker. Although Ms. Miller had requested to speak to defendant about the sex abuse allegations on October 8, 1985, after interviewing his wife and daughters the previous evening, she was told by the Old Bridge Police to postpone the interview of defendant, "because they had some criminal matters that they had to take care of with him first." After defendant had been arrested and incarcerated on October 8th, Ms. Miller stopped by headquarters and picked up a copy of the complaint as well as the Miranda card which defendant had *43 signed. Thus, Ms. Miller was aware that defendant had been advised of his rights when she arrived at the Corrections Center on October 9th.
The interview between defendant and Ms. Miller took place in a small office or "Special Needs Pod" within the Corrections Center, but outside of the presence of the police or the prison guards. Ms. Miller introduced herself as a DYFS caseworker and explained that she needed to discuss the allegations of sexual abuse with him. Defendant, however, expressed reservations about discussing these allegations and told Ms. Miller that "he had talked with his two lawyers and he had talked to his father and he had talked to his girlfriend Jean Darpino and he wasn't sure if his lawyer would get mad at him for speaking to [her]." In response, Ms. Miller told him that "he should do what he thought was best" and explained that although she did not work for the prosecutor's office or the police department, a copy of his statement would be sent to the prosecutor's office.
Ms. Miller did not pressure defendant into talking or indicate that the interview would be for his benefit. However, she did tell him, "You can talk to me, this is part of the investigation", to which defendant apparently responded, "I don't know whether my lawyer will be mad at me or not but I have nothing to lose so I'm going to talk to you." Although defendant was aware at this time that he did not have to talk to her and that he had the right to have an attorney present, he was not re-advised of his Miranda rights by Ms. Miller prior to giving the interview. The interview lasted an hour and 15 minutes. Eventually, Ms. Miller turned defendant's statement over to the Middlesex County Prosecutor's Office.
On April 1, 1986, defendant was indicted by the Middlesex County Grand Jury and charged with two counts of aggravated sexual assault (N.J.S.A. 2C:14-2a) and two counts of endangering the welfare of a child (N.J.S.A. 2C:24-4a). Following his not guilty plea to the indictment, defendant moved to suppress the statement given to the DYFS caseworker pursuant to R. *44 3:13-1(b). The trial court denied the motion, reasoning, in part, that:
In view of the purpose of Miranda, the fact that DYFS is not a law enforcement agency or arm of the police, that the statement made by defendant was voluntarily given, that there was no coercion or physical force applied, that defendant was aware of his rights and availability of his attorney, and the nature of the offense, I find that no Miranda warnings had to be issued by Ms. Miller of DYFS, and that the voluntary statement made by defendant is admissible as evidence.
* * * * * * * *
I find that Detective Lenning gave appropriate Miranda warnings to George Helewa, Sr., on October 8, 1985. Ms. Miller, a DYFS worker employed by the State of New Jersey, is not a law enforcement officer as defined under the requirements of Miranda v. Arizona, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966). Defendant was fully informed by Ms. Miller of her purpose, he was told the interview was not confidential, he was not physically or psychologically coerced, he realized his Sixth Amendment right to counsel, and he freely and voluntarily conversed with Ms. Miller. Considering the circumstances, Mr. Helewa freely, intelligently, and knowingly waived his right to silence. I find his statements to Ms. Miller admissible as evidence.
We granted defendant leave to appeal.

I.
The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in a criminal case to be a witness against himself." In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court announced the rule which is now a recognized standard of Fifth Amendment protection against overbearing and coercive police interrogation:
... the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. [Miranda, [384 U.S. at 444, 86 S.Ct. at 1612], 16 L.Ed.2d at 706 (Emphasis added)].
It is undisputed that defendant was not re-advised by Ms. Miller of his Miranda rights prior to giving her a statement while in *45 custody. Thus, in order to determine whether this statement was the product of an unconstitutional custodial interrogation, it is necessary to consider whether a DYFS caseworker, under the circumstances here present, should be equated with a "law enforcement officer" for the purposes of the Fifth Amendment safeguards mandated by Miranda and its progeny. If so, unless the DYFS caseworker advises defendant of his Miranda rights before obtaining a statement from him during a custodial interview, the State may be precluded from using that statement against defendant in its case-in-chief.
Perhaps the most helpful post  Miranda United States Supreme Court decision dealing with this subject is Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). There, the defendant sought to suppress incriminating documents given and oral statements made to an IRS agent while he was serving a state sentence. Before eliciting any information, the agent did not advise the defendant of his Miranda rights. Although the agent had apparently questioned the defendant as part of a "routine tax investigation" for the purpose of initiating a civil action, the Government began a full-fledged criminal investigation eight days later and successfully prosecuted defendant for two counts of tax fraud. In seeking affirmance of this conviction, the Government argued primarily that Miranda did not apply since "[the] questions were asked as part of a routine tax investigation where no criminal proceedings might even be brought ..." Mathis, 391 U.S. at 4, 88 S.Ct. at 1504, 20 L.Ed.2d at 384. The United States Supreme Court rejected this argument, reasoning, in part, as follows:
It is true that a "routine tax investigation" may be initiated for the purpose of a civil action rather than criminal prosecution ... But tax investigations frequently lead to criminal prosecutions, just as the one here did ... And, as the investigating revenue agent was compelled to admit, there was always the possibility during his investigation that his work would end up in a criminal prosecution. [Ibid.]

Analogously, in Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the United States Supreme Court *46 held that a court-ordered psychiatric examination, given without Miranda warnings, cannot be used in the penalty proceeding of a capital murder case to demonstrate the defendant's depravity. In reaching this decision, the Court stated:
[T]hat respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting. [Id., [451 U.S. at 467, 101 S.Ct. at 1875], 68 L.Ed.2d at 372].
Similarly, in United States v. Mata-Abundiz, 717 F.2d 1277 (9th Cir.1983), the defendant was arrested and incarcerated on state firearm charges. Ten days later an experienced criminal investigator from the Immigration and Naturalization Service (INS) came to talk to defendant about his immigration status. Although well-aware that possession of firearms by an illegal alien constitutes a separate federal offense, the investigator failed to advise defendant of his Miranda rights before inquiring into his citizenship. After ascertaining that defendant was a Mexican citizen, the investigator left the prison and returned within hours with a warrant for defendant's arrest on the federal charge.
Relying primarily upon Mathis, the Court of Appeals for the Ninth Circuit rejected the trial court's conclusion that Miranda was not applicable because the interview occurred during a civil investigation. As the United States Supreme Court stated in Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 308 (1980), `interrogation' refers to questioning which is "reasonably likely to elicit an incriminating response from the suspect." Thus, in view of the INS officer's knowledge that "evidence of alienage, coupled with the evidence of firearms possession, could lead to federal prosecution under 18 U.S.C. App. § 202," as well as the immediate steps taken to start criminal prosecution, the circuit court held that the *47 government could not evade Miranda merely by labelling the investigation as "civil." Mata-Abundiz, 717 F.2d at 1279.
Following the reasoning underlying the decisions reached in Mathis, Smith and Mata-Abundiz, we are convinced that Miranda applies to a custodial interview conducted by a DYFS caseworker, such as Ms. Miller under the circumstances here present. Although a DYFS caseworker is required by statute, N.J.S.A. 9:6-1 et seq., and its own internal guidelines to investigate allegations of child sex abuse, such investigations "frequently lead to criminal prosecutions, just as the one here did ..." Mathis, 391 U.S. at 4, 88 S.Ct. at 1505, 20 L.Ed.2d at 384. Moreover, an examination of the applicable DYFS statutes and regulations and the working relationship that existed here between DYFS and the Middlesex County Prosecutor's Office compels the conclusion that Ms. Miller's custodial interview of defendant must be equated with that of a law enforcement officer for purposes of triggering Miranda.
The role of DYFS in investigating allegations of sexual abuse of children by a parent or guardian is governed by N.J.S.A. 9:6-1 et seq. N.J.S.A. 9:6-8.36a provides, in pertinent part, that "[t]he Division of Youth and Family Services shall immediately report all instances of suspected child abuse and neglect, as defined by regulations, to the county prosecutor of the county in which the child resides." Additionally, N.J.S.A. 9:6-8.10a provides that although reports made pursuant to N.J.S.A. 9:6-8.40 are to be kept confidential, they may be disclosed to the court as well as "[a] police or other law enforcement agency investigating a report of child abuse or neglect;" N.J.S.A. 9:6-8.10a b.(2), and "[a] grand jury upon its determination that access to such records is necessary in the conduct of its official business." N.J.S.A. 9:6-8.10a b.(7).
The existence of a close working relationship between DYFS and the law enforcement agencies in cases of child abuse is also evident from the related provisions of N.J.A.C. 10.129-1.1 to 1.5, which govern the referral of child abuse cases by DYFS to *48 the prosecutor's office. N.J.A.C. 10.129-1.1 sets forth the following objective:
4. To establish a framework for liaison and improved communication and cooperation between the Division's district offices and the several prosecutors' offices in order to further the mutual goals of protecting the child and proper law enforcement.
This goal is reflected in Section 505 of the internal Policy & Procedures of DYFS, entitled "Cooperation Between DYFS and Law Enforcement", and Section 1200, entitled "Reporting to the County Prosecutor", both of which stress the importance of communication and the exchange of information between the agencies. As is evident from Subsections 504.2 and 524, DYFS caseworkers are required to interview the alleged perpetrator after a report of sexual abuse and their subsequent recommendations play an important part in the prosecutor's decision to file a criminal complaint. See Subsections 1209-1215.
These policy objectives have been fully implemented between DYFS and the Middlesex County Prosecutor's Office. At the suppression hearing, Joyce Munkacsi, Chief of the Sex Crimes and Child Abuse Unit for the Middlesex Prosecutor's Office, agreed that there is significant cooperation with DYFS during the investigatory stages of child abuse cases, specifically with respect to the exchange of reports and other sources of information. In sum, the situation is similar to that where an IRS or INS agent takes a statement pursuant to a routine civil investigation or where a neutral, court-appointed psychiatrist obtains information relating to a defendant's state of mind. Although the DYFS caseworker's ultimate purpose in obtaining information from the alleged perpetrator is to ensure the protection and welfare of the child, the likelihood of such information being used against the perpetrator in a criminal prosecution changes the status of the "social worker" to one of a "law enforcement officer" in the context of Miranda.
The conclusion we reach here is supported by case law within our own jurisdiction as well. For example, in State v. Davis, 67 N.J. 222 (1975), cert. den. 425 U.S. 943, 96 S.Ct. 1684, 48 *49 L.Ed.2d 187 (1976), the defendant was tried and convicted for armed robbery. At his trial, the defendant offered several alibi witnesses who testified that he was not near the scene of the robbery at the time it occurred. In order to rebut this testimony the State called the defendant's parole officer, who testified that he had spoken to the defendant while he was incarcerated and that the defendant had told him that he was in fact in the vicinity of the crime on that date. In reversing the conviction, the New Jersey Supreme Court distinguished the situation from routine parole interviews where the "parole officer acts as a guide and counselor to the parolee in his efforts to achieve and maintain rehabilitation." Id. at 226. While these types of interviews are outside the ambit of Miranda, the situation in Davis presented distinct penal consequences:
Pace was in jail charged with having committed an armed robbery when he was questioned by his parole officer. Obviously the officer knew of the charge against Pace since the questions asked related to Pace's whereabouts on and about the date of the robbery.
Admittedly, the questioning was pertinent as to whether or not Pace was adhering to the conditions of his parole so that the statement Pace gave at that time would be a part of his parole record and available in any future parole proceedings.
However, to attempt to use that in-custody statement outside the framework of the parole system and at Pace's subsequent criminal trial on the charge of armed robbery, implicated defendant's constitutional rights and would require a showing that Pace had first been advised of such rights under Miranda and had knowingly and voluntarily waived them. [Id. at 227].
Similarly, in State in Interest of J.P.B., 143 N.J. Super. 96 (App.Div. 1976), a juvenile was convicted of robbery and murder and adjudged delinquent. On appeal, we held incriminating statements given by the juvenile while a resident of a juvenile probationary institution to the supervisor during a "guided group instruction" to be inadmissible. Considering the juvenile's statement to be elicited in the context of a custodial interrogation, we reasoned that:
Axelrod was employed by the State as a supervisor of a state institution directly involved in dealing with juvenile offenders. The questioning conducted by him was by virtue of his authority as an agent of the State. The group session at which the incriminating statement was given focused upon J.B. as the primary subject. While the session's concentration on J.B. was not literally *50 an investigation of J.B. as a criminal suspect or an interrogation directed to any particular crime, it was nevertheless aimed at uncovering personal anti-social behavior and its thrust was the revelation of the individual's past history, including criminal acts. Moreover, the questioning had coercive aspects. In addition to the custodial setting, each boy participating in the group therapy sessions was instructed to give a full statement of his personal problems, including criminal behavior when he was the subject or focus of the particular meeting. Also, it was generally understood among the "students" at Highfields that failure to cooperate fully in the group sessions would entail sanctions and that unresponsive person [sic] would be considered "unsuitable" for the Highfields program and be remanded to the court for sentencing to Yardville. [Id. at 104-105].
Thus, we hold that in the circumstances here the DYFS caseworker must be equated with a law enforcement officer for purposes of Miranda when conducting a custodial interview of a defendant charged with or suspected of committing a criminal offense. If, in such circumstances, the defendant has not been advised of his Miranda rights, any statement or information obtained by the DYFS caseworker from the defendant may not be used in a subsequent prosecution of defendant by the State in its case-in-chief.
The cases in other jurisdictions cited by the State are distinguishable and only superficially support the conclusion that a DYFS caseworker should not be required to give the Miranda warnings before conducting a custodial interview. For example, in People v. Griffin, 130 Misc.2d 297, 496 N.Y.S.2d 605 (N.Y.Sup. 1985), defendant, a staff member at a health facility, sought to suppress statements given to a Patient Care Investigator for the New York Department of Health. The interview, which was conducted for the purpose of investigating allegations of patient abuse, took place in the hospital itself. As in the case at bar, the investigator stated her position and the purpose of her visit before advising defendant that her statement could be used against her. Although this case is distinguishable insofar as the interview took place within the confines of a hospital rather than a prison, the court's decision that Miranda did not apply was based on the fact that "there was no clear connection between the police and the investigation", Id. 496 N.Y.S.2d at 606, since the investigation was not supervised *51 nor undertaken on behalf of the police and did not focus on any particular staff member. Moreover, as the State argues here, the court found it significant that the New York statutes and regulations limited the authority of the Health Department to "investigating complaints and, where appropriate, providing such information to the authorities empowered to prosecute (i.e. the District Attorney)." Id. 496 N.Y.S.2d at 607. See also Boyd v. State, 743 P.2d 674 (Okl.Cr. 1987) (Suspected Child Abuse and Neglect (S.C.A.N.) workers not law enforcement officers merely because they are required by statute to report suspected cases of child abuse to police); People v. Lipsky, 102 Misc.2d 19, 423 N.Y.S.2d 599 (N.Y. Co. Ct. 1979) (holding that a social worker who was required to obtain and report social history of arrestees to court and probation officer who supervised inmates and wrote pre-sentence reports were not law enforcement officers for purposes of Miranda); Com. v. Roberts, 6 Mass. App. 891, 376 N.E.2d 895 (1978) (Un-Mirandized confession made by defendant in hospital to social worker which was overheard by police held admissible since social worker "was [not] acting as the agent or instrument of the police pursuant to a scheme to elicit statements from the defendant." Id. at 896. (Emphasis added)); Paez v. State, 681 S.W.2d 34 (Tex.Cr.App. 1984) (holding that a state employee does not become an agent of law enforcement within the context of Miranda unless there exists a police practice of using non-law enforcement personnel to accomplish what the police could not have lawfully accomplished themselves).
In our view, the critical issue is not whether the custodial interview was undertaken at the direction of police authority or whether it was conducted pursuant to the state's statutory policy or scheme requiring those similarly situated to our DYFS caseworkers to report criminal conduct discovered during the course of a civil investigation. Rather, the issue is whether the custodial interview of a defendant charged with or suspected of a criminal offense is likely to lead to a criminal prosecution. Here, we simply hold that because of the close working relationship *52 between DYFS and the Middlesex County Prosecutor's Office, the DYFS caseworker must be equated with a law enforcement officer for purposes of Miranda when conducting a custodial interview.

II.
Although we hold that Miranda applies to DYFS interviews in custodial circumstances similar to those here involved, it is clear that defendant was properly advised of his Miranda rights and that he understood and knowingly waived them. The trial court specifically found that Detective Lenning read defendant his Miranda rights and defendant then read the warnings card and placed his signature on it. Defendant did not request an attorney and did not invoke his right to remain silent. Defendant was not questioned and was not even asked whether he wanted to make a statement. Moreover, the following day, when Ms. Miller went to interview him, defendant again did not invoke his right to remain silent or request an attorney. Therefore, it was unnecessary for Ms. Miller or anyone else to re-advise defendant of his Miranda rights before conducting an interview. See for example, State v. Magee, 52 N.J. 352 (1968) cert. den. 393 U.S. 1097, 89 S.Ct. 891, 21 L.Ed.2d 789 (1969); State v. Melvin, 65 N.J. 1, 14 (1974); Brown v. Tard, 552 F. Supp. 1341, 1349 (D.N.J. 1982). In Magee, the defendant was arrested and given Miranda warnings, at which point he waived his right to counsel and gave a brief statement to the police. Two days later, prior to his arraignment on narcotics charges, the defendant made unsolicited statements implicating his involvement in a murder which led to a full confession. In rejecting the defendant's contention that fresh warnings were required when he offered the unsolicited invitation for further questioning, the Court held that:
[o]nce Miranda's rule has been complied with at the threshold of the questioning it is not necessary as a matter of law to repeat the warnings at each successive interview. [Id. at 374].
While we are mindful that the DYFS interview may constitute a different species of custodial interrogation than that *53 conducted by a traditional law enforcement officer, we see no reason to require DYFS caseworkers to administer additional warnings where the police would not be under a concomitant duty. Here, we emphasize that the trial court specifically found that defendant did not invoke his right to remain silent or request the assistance of counsel after he was advised of his Miranda rights by Detective Lenning on October 8, 1985. Moreover, defendant was fully cognizant of these rights when Ms. Miller interviewed him the following day. Prior to conducting the interview, Ms. Miller explained to defendant the consequences of his speaking to her by advising him that a report of the interview would be sent to the court as well as the prosecutor's office.
As noted by the Supreme Court in State v. Kennedy, 97 N.J. 278, 288 (1984), "[t]he bare fact that defendant had counsel representing him cannot be construed to preclude defendant from effectively waiving his right to remain silent and to have an attorney present", even where the defendant has been previously admonished by counsel not to offer any incriminating information. Although defendant at first expressed a reluctance to speak to Ms. Miller because he thought "his attorney would get mad", he nevertheless assented because he felt he had nothing to lose: "the classic case of the criminal defendant who `stubbed his toe.'" Kennedy, 97 N.J. at 289; State v. McKnight, 52 N.J. 35, 52 (1968). In the circumstances, the custodial interview did not violate defendant's Miranda rights.
Accordingly, we affirm the order denying the motion to suppress defendant's statement given to Ms. Miller during the custodial interview.
SHEBELL, J.A.D., concurring in part and dissenting in result.
I concur in the holding of the majority that the relationship between DYFS and law enforcement in the circumstances of *54 this case compels the conclusion that Miranda warnings must be given to a person subject to a custodial interrogation by a DYFS caseworker if the results of the interrogation are then to be used in a criminal prosecution. I do not perceive that this will in any way hinder the work of DYFS as they may well conclude that it is more important to carry out the functions of their own office than to accommodate the law enforcement authorities by giving Miranda warnings in advance of their interviews. The only consequence will be that law enforcement cannot use the statements against a defendant in a criminal prosecution.
I dissent and part company with the majority, however, in their conclusion that "it was unnecessary ... to re-advise defendant of his Miranda right before conducting an interview." The very purpose of Miranda warnings is to permit an individual the full opportunity to exercise his rights and to enable the individual to combat the inherently compelling pressures of custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694, 719 (1966). We must assume that a defendant will seek to take advantage of his basic rights, and we therefore "indulge every reasonable presumption against waiver of [these] fundamental constitutional rights." State v. McCloskey, 90 N.J. 18, 25 (1982).
In my view, the majority loses sight of the fact that the interview by the DYFS caseworker was a completely different species of interrogation than defendant had been confronted with the previous day when he was given his Miranda warnings. Defendant may well have been confused as to whether the same rights applied, as well as the extent to which the statement could be used against him. While he was told that the statement would be turned over to the prosecutor, he was not specifically informed that its contents could be used against him in the criminal court. While the caseworker claimed that she told him a copy of the interview would be sent to the court, it would have been most reasonable for the defendant to assume that she meant the Family Court.
*55 What is perfectly clear is that the defendant had reservations about making the statement, was represented by counsel and was specifically concerned about his lawyer's reaction to him giving a statement. Defendant was told by the caseworker "[y]ou can talk to me, this is part of the investigation." The defendant submitted to the interview which lasted over an hour and a half, because he believed, "I have nothing to lose so I am going to talk to you." It is hard to conceive that in these circumstances giving defendant fresh Miranda warnings was not required in the interest of scrupulously honoring his right to remain silent and his related constitutional rights. Miranda, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.
I would reverse.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).