284 N.J. Super. 654 (1995)
666 A.2d 199
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CHRISTOPHER BIANCAMANO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1995.
Decided October 31, 1995.
*656 Before Judges DREIER, A.M. STEIN and KESTIN.
Katherine Lusby, Designated Counsel, argued the cause for appellant (Susan L. Reisner, Public Defender, attorney; Ms. Lusby, of counsel and on the brief).
Jennifer L. Gottschalk, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Ms. Gottschalk, of counsel and on the brief).
The opinion of the court was delivered by DREIER, P.J.A.D.
Defendant appeals from convictions of third-degree possession of LSD, N.J.S.A. 2C:35-10a(1) and 2C:2-6; first-degree possession of LSD with intent to distribute, N.J.S.A. 2C:35-5a(1), -5b(6), -8 and 2C:2-6; third-degree possession with intent to distribute within 1,000 feet of school property, N.J.S.A. 2C:35-5a, -7, -8 and 2C:2-6; first-degree distribution of LSD to a person under eighteen, N.J.S.A. 2C:35-5a(1), -5b(6), and -8; and second-degree employing of a juvenile in a drug distribution scheme, N.J.S.A. *657 2C:35-5 and -6. The judge merged the other convictions into the two first-degree crimes and sentenced defendant to concurrent twelve-year terms for the two crimes, each with a five-year parole disqualifier. Thus, defendant's total sentence amounted to a twelve-year term with a five-year parole disqualifier.
Defendant, then an eighteen-year-old repeating senior at Clifton High School, allegedly approached a fellow student, J.Z., on March 6, 1991, about assisting him in dispensing LSD to students at the school Their arrangement was that defendant would pay J.Z. for distributing a drug that J.Z. believed to be mescaline. On March 13, 1991, defendant hid small tablets of LSD in a Bic pen with a ten dollar bill wrapped around it and gave the tablets to J.Z. to distribute. During the course of the school day, J.Z. distributed the drugs to students who had prepaid for them. At the end of the day, J.Z. returned the pen to defendant. The next day defendant gave J.Z. a new pen filled with similar tablets, which he distributed in the same manner.
Before school on March 15, 1991, J.Z. met defendant and A.B., another student, at a nearby coffee truck and gave defendant $50. Defendant and A.B. then drove to the senior parking lot at the school where defendant met with T.T. to obtain the drugs hidden in the Bic pen. Once inside the school, A.B. saw defendant give the pen to J.Z.J.Z. proceeded to hand out the tablets to the students.
Later that same day, J.Z. was called to the principal's office by the vice-principal, William Cannici, who questioned J.Z. about his drug dealing. After being asked by Cannici to remove the contents of his pockets, J.Z. removed, among other items, a Bic pen. Although Cannici examined the pen and removed the ink cartridge, he did not see any tablets. Cannici then searched J.Z.'s locker but did not find any contraband. Upon returning to his office with J.Z., Cannici tapped the Bic pen on the desk and two small tablets fell out. Assuming that the tablets were narcotics, Cannici recommended that J.Z. cooperate. J.Z. placed another Bic pen on the desk, which contained, instead of an ink cartridge, *658 43 small tablets similar to the ones found in the other pen. J.Z. informed Cannici that defendant had supplied J.Z. with the drugs.
Cannici then questioned defendant in his office with the principal present. Although defendant's version of the events did not exactly match J.Z.'s, defendant admitted that he drove A.B. to school that morning, met with T.T. in the senior parking lot and gave the pen filled with drugs to J.Z. at the coffee truck near the school. Defendant also stated that he had given 100 "hits" to J.Z. over the previous two weeks. After interviewing defendant for approximately one hour and fifteen minutes, Cannici left the room. When he returned, defendant had already retrieved his car keys from the top of Cannici's desk and left the building.
A.B. informed Cannici that defendant told him that he hid all the drugs located at his house in a nearby wall. This information was passed on to the local police. Later that day, a Clifton police detective went to defendant's home. After obtaining defendant's father's signature on a consent-to-search form, the detective searched defendant's room where he found and seized a beeper. He also searched a nearby retaining wall and found a plastic bag containing sixty-one LSD tablets and other LSD tablets and pill fragments in a smaller plastic bag.
Defendant moved at trial to suppress his statement and the physical evidence taken from J.Z.'s person and defendant's home.
On appeal defendant raises the following issues:
POINT I. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF DRUGS SEIZED FROM J.Z. BECAUSE THE SEARCH WAS NEITHER CONSENSUAL NOR BASED ON REASONABLE CAUSE AND BECAUSE THE TRIAL COURT ERRED IN FINDING DEFENDANT LACKED A REASONABLE EXPECTATION OF PRIVACY IN DRUGS SEIZED FROM J.Z.
POINT 1A. THE SEARCH OF J.Z. WHICH REVEALED 45 TABS OF LSD SECRETED IN PENS IS NOT JUSTIFIABLE AS A CONSENT SEARCH BECAUSE J.Z. WAS NOT AWARE OF HIS RIGHT TO REFUSE.
POINT 1B. THE SEARCH OF J.Z. CANNOT BE JUSTIFIED ON THE BASIS OF REASONABLE CAUSE BECAUSE THERE WAS INSUFFICIENT FACTS REVEALED AT THE PRE-TRIAL HEARING TO SUPPORT A FINDING OF REASONABLE CAUSE.

*659 POINT 1C. THE TRIAL COURT ERRED IN DETERMINING THAT DEFENDANT DID NOT HAVE AN EXPECTATION OF PRIVACY IN THE PENS WHICH WERE SEIZED FROM JASON AND WERE ADMITTED INTO EVIDENCE AGAINST HIM AT TRIAL.
POINT II. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS DEFENDANT'S STATEMENT GIVEN TO THE VICE PRINCIPAL OF THE SCHOOL BECAUSE HE WAS NOT INFORMED OF HIS CONSTITUTIONAL RIGHTS NOR WARNED OF THE CONSEQUENCES OF HIS ACTIONS.
POINT III. THE TRIAL COURT ERRED IN SENTENCING DEFENDANT TO A MANDATORY MINIMUM WHICH IS MORE THAN ONE THIRD OF THE BASE TERM.
Defendant first challenges the seizure of the physical evidence from J.Z. There is no question that under State v. Alston, 88 N.J. 211, 228, 440 A.2d 1311 (1981), defendant has standing to question Cannici's taking the Bic pen from J.Z. and examining it. The search is governed by the standards of New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). There, the Supreme Court determined that the Fourth Amendment of the United States Constitution applies to a school official's search of students inside a school. 469 U.S. at 333, 105 S.Ct. at 738, 83 L.Ed.2d at 729. However, the Court determined:
[T]he school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject. The warrant requirement in particular is unsuited to the school environment: requiring a teacher to obtain a warrant before searching a child suspected of an infraction of school rules (or of the criminal law) would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools.
[469 U.S. at 340, 105 S.Ct. at 742, 83 L.Ed.2d at 733.]
The Court, therefore, determined "that school officials need not obtain a warrant before searching a student who is under their authority." 469 U.S. at 340, 105 S.Ct. at 742, 83 L.Ed.2d at 734. The Court then adopted a standard of reasonable suspicion, recognizing that the public interest is best served by a standard of reasonableness that stops short of probable cause. 469 U.S. at 341, 105 S.Ct. at 742, 83 L.Ed.2d at 734. The Court explained:
[T]he legality of the search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: First, one must consider `whether the ... action was justified at its inception[;]' second, one must determine whether the *660 search as actually conducted `was reasonably related in scope to the circumstances which justified the interference in the first place.' Under the circumstances, a search of a student by a teacher or other school official will be `justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.
[469 U.S. at 341-342, 105 S.Ct. at 742-743, 83 L.Ed.2d at 734-735 (quoting Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968)).]
Applying this standard to the facts before us, we have no hesitancy in upholding the search of J.Z. The vice-principal was informed by a confidential informant that J.Z. was distributing drugs. Apprised of such information, Cannici certainly had a reasonable suspicion that J.Z. might have such drugs in his possession. If the suspicion held by the assistant vice-principal in T.L.O. that the student had been smoking was a sufficient basis to search her purse for cigarettes, the information in the case before us that J.Z. had been distributing drugs cannot justifiably be challenged as a basis for searching the pen that J.Z. had removed from his pocket. Once the initial drugs were found, J.Z.'s production of the additional drugs, his implication of defendant, and the later police search at defendant's home pursuant to a consent signed by his father also cannot readily be challenged.
Furthermore, the vice-principal need not reveal the identity of his confidential informant, as the informant played no part in the discovery of the drugs. See N.J.R.E. 516 (formerly Evid.R. 36). The informant was neither an "essential witness on a basic issue in the case" nor was he or she apparently "an active participant in the crime for which defendant is prosecuted." State v. Milligan, 71 N.J. 373, 383-384, 365 A.2d 914 (1976).
Defendant next contends that he is entitled to suppress the statement that he had sold drugs on March 15, 1991, a comment which he characterized at the suppression hearing as a sarcastic remark made when questioned by the vice-principal. Defendant argues that suppression is required because he had not received *661 the appropriate warnings required by Miranda v. Arizona, 384 U.S. 436, 467-468, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694, 720 (1966). Miranda warnings are necessary only where there is "custodial interrogation," defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The trial judge determined that Cannici had not acted "in a law enforcement capacity" nor was he acting "as an agent for the police at the time of the questioning of defendant." The court found that Cannici "was acting in his capacity as a vice-principal whose duties included, inter alia, the welfare and safety of his students." The trial judge further determined that defendant's statements were voluntary and that defendant had not been coerced in any way when he made the admissions. The judge concluded that this questioning could not be equated with custodial interrogations by law enforcement officers, and he denied defendant's suppression motion.
No New Jersey case defines the application of Miranda principles to an interrogation by a school official. We have no doubt, however, that the T.L.O. standards concerning Fourth Amendment searches are equally applicable to defendant's Fifth Amendment claim. A school official must have leeway to question students regarding activities that constitute either a violation of the law or a violation of school rules. This latitude is necessary to maintain discipline, to determine whether a student should be excluded from the school, and to decide whether further protection is needed for the student being questioned or for others. The United States Supreme Court in T.L.O. specifically stated that it was considering "only searches carried out by school authorities acting alone and on their own authority." 469 U.S. at 342 n. 7, 105 S.Ct. at 743 n. 7, 83 L.Ed.2d at 735 n. 7. The Court left open "the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies." Ibid. This question is also *662 not before us since there is no allegation that the vice-principal questioned defendant at the behest of the police.
We realize that, in other settings, public employees other than the police have been held subject to the warrant requirement governing searches and seizures. See T.L.O., supra, 469 U.S. at 335, 105 S.Ct. at 739, 83 L.Ed.2d at 730 (listing cases involving building inspectors, OSHA inspectors, and firemen). We believe the principles from these Fourth Amendment cases should be extended to the questioning of an individual who asserts a Fifth Amendment claim.
In New Jersey we considered a related issue in State v. Helewa, 223 N.J. Super. 40, 537 A.2d 1328 (App.Div. 1988). There, Judge Michels determined that a Miranda waiver should have been obtained by an investigating DYFS official. Id. at 47, 537 A.2d 1328.[1] The DYFS caseworker in Helewa was governed by New Jersey statutes requiring the immediate report of all instances of suspected child abuse and neglect to the county prosecutor, abrogating the usual confidential nature of disclosures to DYFS caseworkers. Id. at 47, 537 A.2d 1328. Thus, in Helewa, this court held that under the facts presented, "the DYFS caseworker must be equated with a law enforcement officer for the purpose of Miranda when conducting a custodial interview of a defendant charged with or suspected of committing a criminal offense." Id. at 50, 537 A.2d 1328.[2]
*663 We see no reason to extend the Helewa decision to the questioning by a school administrator in the circumstances of the case before us. School officials are neither trained nor equipped to conduct police investigations. However, as a matter of necessity, they must regularly conduct inquiries concerning both violations of school rules and violations of law. While the police may eventually be summoned, the need to question students to determine the existence of weapons, drugs, or potential violence in the school requires that latitude be given to school officials.
The same circumstances were dealt with by the Supreme Judicial Court of Massachusetts in Commonwealth v. Snyder, 413 Mass. 521, 597 N.E.2d 1363 (1992). There, the court minced no words when it stated:
There is no authority requiring a school administrator not acting on behalf of law enforcement officials to furnish Miranda warnings. Even if we were to assume that, during the questioning in the principal's office, the environment was coercive because Snyder was in custody (or because his freedom was significantly restricted) and that, therefore, Miranda warnings would have been required if the questioning had been by the police ... [the principal and assistant principal] were not law enforcement officials or agents of such officials. The Miranda rule does not apply to a private citizen or school administrator who is acting neither as an instrument of the police nor as an agent of the police pursuant to a scheme to elicit statements from the defendant by coercion or guile.... The fact that the school administrators had every intention of turning the marihuana over to the police does not make them agents or instrumentalities of the police in questioning Snyder.
[597 N.E.2d at 1369.]
We concur with the Supreme Judicial Court of Massachusetts. We reject defendant's claim that he was entitled to receive Miranda warnings before he was questioned by vice-principal Cannici.
Lastly, defendant contends that the court failed to give adequate reasons for imposing of more than one-third defendant's base sentence as a parole disqualifier. Defendant received a twelve-year term and a parole ineligibility of five years.
*664 Based upon the court's analysis of the aggravating and mitigating factors, the court could have imposed a prison term of between ten and twenty years for the first-degree crimes of which defendant was convicted. N.J.S.A. 2C:43-6a(1). The trial judge reviewed the aggravating and mitigating factors and determined that there were three aggravating factors: the seriousness of the offense; the need for deterrence; and the fact that imposition of a fine without a term of imprisonment would be perceived as the cost of doing business. N.J.S.A. 2C:44-1a(1), (9), and (11). We recognize that the third of these factors is inapplicable to the case before us, except by analogy. Certainly a fine would not be imposed as the principal punishment for this first-degree offense, and defendant was going to serve some term of imprisonment. Yet a short term of imprisonment also might be considered as merely the cost of doing business, and a longer term may be necessary to impress upon defendant the seriousness of the crime.
The court also found mitigating factors: defendant's conduct was unlikely to recur, and his confinement would cause undue hardship to himself or his dependents. N.J.S.A. 2C:44-1b(8), (11). Although there were more aggravating factors than mitigating factors, the court determined that the weight of the mitigating factors predominated. This is evidenced by the fact that the judge imposed a term less than the presumptive fifteen years, an action that could be taken only if the mitigating factors predominated. N.J.S.A. 2C:44-1(f).
Based on the twelve-year term, the judge was required to impose a period of parole ineligibility of between one-third and one-half of the sentence. N.J.S.A. 2C:35-5b(6). Although the judge had already determined that the mitigating factors predominated, he gave no indication why he chose the middle of this four to six year range rather than the minimum ineligibility term. See State v. Towey, 114 N.J. 69, 81-85, 552 A.2d 994 (1989); State v. Kruse, 105 N.J. 354, 359-361, 521 A.2d 836 (1987).
While defendant's sentence does not shock our conscience, and under State v. Roth, 95 N.J. 334, 364-365, 471 A.2d 370 (1984), we *665 ordinarily would not remand this matter for reconsideration of the sentence, we cannot be sure that the judge analyzed the parole disqualifier as he analyze the base term. State v. Towey, supra, requires more. We realize that a defendant's serving five years as opposed to four years before he is eligible for parole is quite significant, representing a twenty-five percent increase in the sentence. We, therefore, wish to err on the side of caution. Accordingly, we remand this matter to the trial judge for reconsideration of sentence. We do so with no indication what the judge's decision should be. We merely direct that reasons be given for the imposition of the particular parole ineligibility term imposed and that the mandates of State v. Towey be followed.
Defendant's convictions are affirmed, and the matter is remanded to the Law Division for reconsideration of sentence. We do not retain jurisdiction.
NOTES
[1] His analysis relied upon the federal treatment of an interrogation by an Internal Revenue Service agent, Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), questioning by a psychiatrist performing a State-ordered psychiatric examination, Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and information gathered by a naturalization service investigator, United States v. Mata-Abundiz, 717 F.2d 1277 (9th Cir.1988).
[2] Similarly, this court has determined that Miranda warnings were required when the supervisor of a juvenile institution was acting as the agent of a police officer when interrogating a juvenile. In the Interest of J.P.B., 143 N.J. Super. 96, 104-105, 362 A.2d 1183 (App.Div. 1976). Such warnings were not required, however, when a parole officer conducted a noncustodial interview of a parolee. State v. Davis, 67 N.J. 222, 226, 337 A.2d 33 (1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).