**STATE of Iowa, Plaintiff–Appellee,**

v.

**Edward C. DEASES, Defendant–Appellant.**

**No. 90–921.**

Court of Appeals of Iowa.

Oct. 29, 1991.

Linda Del Gallo, State Appellate Defender, and B. John Burns, Asst. State Appellate Defender, for defendant-appellant.

Bonnie J. Campbell, Atty. Gen., Bruce Kempkes, Asst. Atty. Gen., Mary E. Richards, County Atty., and Michael Houchins, Asst. County Atty., for plaintiff-appellee.

Heard by DONIELSON, P.J., and SACKETT and HABHAB, JJ.

SACKETT, Judge.

Defendant-appellant Edward Deases appeals his conviction of first-degree murder, following a jury trial.

Defendant and his brothers Ruben and Johnny Deases, were implicated in the murder of Jennifer Gardner. Johnny was the State's primary witness and had been granted immunity in exchange for his testimony.

Defendant contended Ruben was solely responsible for the actual murder, and he was only involved in the attempted cover-up of the crime. Johnny initially told authorities Ruben murdered Jennifer, and Edward had been involved only in the cover-up. Johnny testified at trial Edward had been involved in planning and executing the murder.

Defendant on appeal contends the trial court erred in (1) admitting deposition testimony of his brother Johnny Deases, and (2) allowing the county attorney to introduce evidence in her closing statement. We affirm.

From the evidence presented, the jury could have found the following facts to be true. Defendant's older brother, Eustaquio Deases, sold drugs in Ames. In the spring of 1989 living with Eustaquio and his girlfriend Jennifer Gardner in his Ames apartment were three of Eustaquio's brothers, Johnny, age 16, Ruben, age 18, and the defendant, age 20. Less than two weeks before Memorial Day in 1989, the defendant mentioned to someone he wished Jennifer would just leave.

On Wednesday, May 24, when Jennifer and the defendant were alone at Eustaquio's apartment, she telephoned a friend and said the defendant was messing with her, aggravating her, and asked the friend to come get her. Jennifer explained she was afraid, she needed to get away, she needed to get out. The friend arrived at Eustaquio's apartment and found Jennifer with a black eye.

On Friday, May 26, Jennifer told the assistant manager of the apartment complex she hated the defendant. The defendant told Johnny that Jennifer was being a problem to Eustaquio.

On Sunday, May 28, Eustaquio left Ames to fly to Texas. An argument erupted that evening at Eustaquio's apartment between defendant, Ruben, Johnny, and Jennifer. Jennifer retired to her bedroom. The defendant and Ruben remained in the living room and discussed how to get rid of Jennifer. The defendant suggested Johnny murder her because, as a juvenile, he would get a lesser sentence. Ruben agreed with the defendant and indicated Johnny should approach her from behind and choke her.

Johnny went to Jennifer's bedroom but could not carry through with his older brothers' plan. Instead, he went and sat on the living room couch, where Jennifer soon joined him.

When Johnny left the couch to go to the kitchen, Ruben sprang upon Jennifer from behind. He locked his arm around her neck and pulled her over the back of the couch and on to the carpet. Gasping for air, she thrashed about for the next forty-five seconds in an attempt to escape his armlock. Then her face turned blue and her body limp; the defendant and Ruben carried her to the apartment's bathroom, laying her on the floor. Jennifer had a bowel movement, so defendant and Ruben started to undress her. Johnny testified that while defendant and Ruben were undressing Jennifer, she pushed herself up, and mumbled, "What's happening? What is this?"

Ruben quickly placed his foot on Jennifer's head and shoulders to keep her pinned down, and the defendant and Johnny hurried about the apartment looking for a belt. The defendant found one. He made a loop in the belt and placed it over Jennifer's head. He put his foot up against the right side of her neck and cinched the loop tight until her hands stopped moving. Ruben then took a turn at pulling on the end of the belt before leaving Jennifer in the bathroom. She was dead.

## I.

Defendant first contends the trial court erred in admitting certain deposition testimony of Johnny Deases. Defense counsel emphasized during opening statement, cross-examination, and closing argument that Johnny's trial testimony was at odds with pretrial statements he made under oath to investigators and with deposition testimony taken for this case.

In opening statement, defense counsel told the jury:

This young man (Johnny), after receiving immunity, ... could say whatever he wanted ..., (and he) consistently ... (said) Ruben killed Jennifer Gardner. He didn't do it once, he didn't do it vaguely, he did it over and over and over again with lots of detail. Three times to law-enforcement personnel; three different statements. Several statements under oath, questioned by me, in the deposition, and Ruben's attorney. He had every opportunity to say whatever he remembered, and he did.

 \* \* \* \* \* \*

(S)ix months after all these statements ... he goes back to his family ... and changes the whole story. (H)e says it ... is Eddie who actually, finally helped kill Jennifer. There is a belt out of nowhere; this has never been mentioned before.

Now I don't know if at the end of this case you're going to know why he changed his story, but I'm sure you'll have some ideas, and I'm sure you'll wonder if you can believe anything this young man says—.... whether or not taking an oath means anything to him in testifying.

 \* \* \* \* \* \*

The evidence ... may well show that Johnny Deases had some vivid imaginations.... But ... your job is (to decide) who put them there and when(.)

It is undisputed in pretrial statements and certain deposition testimony that Johnny made no mention of a belt and indicated Ruben had murdered Jennifer in the living room of Eustaquio's apartment. The medical evidence neither confirmed nor denied the use of a belt.

▮▮ Johnny testified in this case he lied before trial because of sympathy for and fear of the defendant. The defense impeached Johnny with deposition testimony and statements he gave. Defendant's attorney questioned Johnny concerning statements he made (1) to a priest in which he said nothing about defendant taking part in the murder, (2) to the prosecution in which he said nothing about a belt or the defendant taking part in the murder, (3) to defense counsel during a deposition in which he said nothing about a belt or the defendant taking part in the murder, (4) to Ruben's attorney during a deposition in which he said nothing about the defendant taking part in the murder, and (5) to investigating officers during which he said nothing about the defendant taking part in the murder.

On redirect, the county attorney asked: Q. John, you were asked ... different things that you've had occasion to testify about, on I believe nine different occasions, that people have either interviewed you or deposed you, right? A. Right. Q. ... I am going to show you the deposition that was taken by Mr. Tremmel (Ruben's attorney) and Mr. Sedgwick on the eleventh of January of this year, and I am going to ask you the questions and you can just read me ... your answers....

Defendant objected and argued the district court should have excluded the deposition testimony of Johnny because the prior consistent statement was not relevant to refute a charge of recent fabrication.

▮▮ Iowa Rule of Evidence 801(d) defines a statement as nonhearsay if:

(1) The declarant testifies at the trial ... and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge of recent fabrication or improper influence or motive....

Rule 801(d)(1)(B) permitted the district court to admit Johnny's deposition testimony as a prior consistent statement, as the

rule imposes no requirement the defense have an opportunity to cross-examine the declarant at the time he or she makes the statement.

■ Johnny's prior consistent statements, made under oath at a deposition taken by an adverse party, can be considered reliable. *See generally* Iowa R.Evid. 803(24). There is support for the admission into evidence of the testimony Johnny gave on deposition. *See State v. Brotherton*, 384 N.W.2d 375, 380–81 (Iowa 1986) (proper to admit prior statement by victim to third party for rebutting extensive cross-examination of victim); *State v. Jespersen*, 360 N.W.2d 804, 806–07 (Iowa 1985) (proper to admit prior statement by witness during testimony by second witness to rebut implication during cross-examination that first witness had lied at trial); *see also United States v. Cifarelli*, 589 F.2d 180, 185 (5th Cir.1979); *United States v. Williams*, 573 F.2d 284, 288–89 (5th Cir.1978). *See generally* Annotation, *Corroboration—Consistent Statements*, 75 A.L.R.2d 909 (1961).

Additionally, defense counsel opened the door for the State to rehabilitate Johnny with his prior consistent statements after cross-examining him about prior inconsistent statements and talking extensively about them in opening statement. *See State v. Thompson*, 397 N.W.2d 679, 681–82 (Iowa 1986) (proper to admit prosecution witness's pretrial deposition testimony in case-in-chief when she could not recall specific events established by deposition; moreover, accused's use of deposition for cross-examination opened door for prosecution's redirect examination).

## II.

The defendant next claims the district court permitted the county attorney, over the defendant's objection, to create evidence during her closing argument. During closing argument, the county attorney, addressing Johnny Deases' inability to remember details of the death of Jennifer, said:

I really empathize with him. I knew exactly what he meant, because I've had things like that happen to me in my life. I remember at least twice where I saw an accident. One time when I was about—

Defendant's attorney: Your Honor, I am going to object to facts that have not been presented into evidence. These are instances that did not come into this trial.

The Court: I suppose that probably is a personal experience, but common observations are admissible. You use your own judgment. You may proceed.

County attorney: Thank you, Your Honor. I believe this is a common observation. I think it has happened to everybody. In my case, I was with my parents and my brothers in a car, and we came on a motorcycle accident, at least I think my brothers were there. I assume they were, because if my parents were there, my brothers would have to be; but I don't really remember that. I don't remember anything anybody said; but I do remember I could draw you a picture of where the motorcycle was lying in the gravel, and where the woman was lying who had been on it, and where the man was lying who had been on it. And I could draw you a picture of the way she was lying, you know, very unnaturally the way you wouldn't lie if you were just lying down; and the way her clothes were torn; and the way there was blood coming out of her nose and her ear. I remember that as if it had been yesterday but I can't tell you anything anyone said. And I can't tell you if my brothers were there. I can't tell you what we did before that day. But you know what kind of experience that is, because you folks have had the same kinds of experiences. You know why it is that Johnny can tell you without hesitation and very specifically and demonstrate to you what he observed in the living room and in the bathroom on Sunday, the 28th day of May of last year.

Defendant argues the county attorney by this argument actually called herself as a witness to an incident and defendant has no opportunity to cross-examine or impeach her. Defendant argues this is beyond an

attorney exercising his or her reasonable latitude in analyzing evidence that was properly admitted. Defendant claims the district court abused its discretion in permitting the county attorney to so argue on the ground it was in the realm of common experience.

 In reviewing district court rulings on objections to argument by counsel, the applicable standard is whether the district court abused its discretion. *State v. Pepples*, 250 N.W.2d 390, 396 (Iowa 1977). Counsel has no right to create evidence during argument. *Id.* Nor does counsel have the right to create evidence by argument. *See State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975). Although relating one's own childhood memories in a closing argument is not analyzing the evidence, we do not find this so prejudicial as to deprive the defendant of a fair trial. A prosecutor's misconduct will not warrant a new trial unless the conduct was "so prejudicial as to deprive the defendant of a fair trial." *State v. Anderson*, 448 N.W.2d 32, 33 (Iowa 1989). The trial court did not abuse its discretion.

AFFIRMED.