CADY, Justice
(dissenting).
I respectfully dissent. The majority announces and professes to apply a balancing test to reach its conclusion that Doe must turn over her confidential counseling records for examination by Cashen and his attorney (and others) under a protocol directed by the trial court. In truth, the majority has abandoned the balancing test without acknowledgement. In its place, the majority has substituted a policy judgment that all defendants in a criminal case are entitled to view confidential medical and counseling records of a victim to an alleged crime when the defendant asserts a legal claim or issue that makes the contents of the confidential records relevant to the claim or issue in the case. The balancing test is unceremoniously abandoned because confidential records must now be disclosed once relevance is shown regardless of any particular surrounding circumstances of the case that may reveal a diminished need for the particular records by the defendant and regardless of a heightened need to protect the confidentiality of the records. The majority adopts one of the weakest tests known to the law in an area of the law that deals with the clash of two of the most compelling and venerable interests known to the law. This is a step backwards. It gives the defendant more power than necessary to protect the right to a fair trial, while presenting a serious risk of a different form of abuse for victims of domestic violence. This new test may also ultimately cause victims to decline to report domestic abuse in order to protect themselves from being required to disclose very personal and private information to the alleged abusers and other parties to the prosecution.
One fundamental interest at stake in this case involves a belief of most Iowans that information communicated by a patient to a doctor or counselor will be confidential. For over 150 years, Iowa has recognized that confidential communications between a physician and a patient constitute privileged information. See Iowa Code § 622.10 (2007) (establishing current privilege of confidentiality between physician and patient); 7 Laurie Kratky Dorè, Iowa Practice Series: Evidence § 5.504:2, at 365 & n. 2 (2009) (tracing the root of the physician-patient privilege statute to the 1851 Iowa Code) [hereinafter Doré]. Athough this privilege did not exist at common law, it has been a cornerstone of the professional ethics of physicians for over a century.[3] See 1 Kenneth *412 S. Broun et al., McCormick on Evidence § 98, at 446-47 (6th ed. 2006) [hereinafter McCormick ]. The privilege surfaced in Iowa as an enactment by our legislature in 1851, shortly after we became a state. Iowa Code § 2398 (1851). Today, the venerable statutory privilege not only precludes physicians from disclosing through testimony any confidential communication by a patient, but also prohibits the disclosure of medical records containing confidential communications. State v. Heemstra, 721 N.W.2d 549, 560 (Iowa 2006). The rationale for a law protecting information acquired by a physician from disclosure is to promote complete and open communication by a patient to enable the physician to make a proper diagnosis and render appropriate treatment. State v. Deases, 518 N.W.2d 784, 787 (Iowa 1994). If patients know or fear the information they tell their doctor may be disclosed in the future, they may be reluctant to disclose information embarrassing to them but needed by the doctor to render proper care.
While our rules and cases applying Iowa Code section 622.10 generally reflect “great solicitude for the physician-patient privilege,” the privilege is deemed to be even more important in the treatment of mental health. Heemstra, 721 N.W.2d at 560-61. The greater protections in the area of mental health treatment are justified primarily because of the enhanced need for a strong relationship of trust and confidence between the patient and provider and the extremely personal and sensitive information frequently disclosed in the course of mental health counseling. See id. at 561. Any threat of disclosure of such information would obstruct, if not bar, successful treatment. See McCormick § 98, at 447. Moreover, unwanted disclosure of highly personal information separately implicates one of the most fundamental tenets of all law—the right to privacy. Heemstra, 721 N.W.2d at 561. Thus, we are not just dealing with a strong belief recognized by statute, but a right with roots found in our constitution. The privilege necessarily recognizes a right to protect the privacy interests of the individual to keep private information from public disclosure, independent from the need for optimum medical treatment recognized by statute. See McMaster v. Bd. of Psychology Exam’rs, 509 N.W.2d 754, 758-59 (Iowa 1993) (recognizing a constitutional right of privacy in mental health records). Nevertheless, all fifty states and the District of Columbia have statutes that protect the communication between patients and their therapists. Jaffee v. Redmond, 518 U.S. 1, 12, 116 S.Ct. 1923, 1929, 135 L.Ed.2d 337, 346 (1996). Our legislature has separately considered the special interest involved in mental health and psychological information and has provided comprehensive rules prohibiting disclosure except under very limited circumstances.[4] See generally *413 Iowa Code ch. 228 (providing rules of limited disclosure for a patient’s mental health records). These rules, however, do not specifically address the disclosure of mental health information in a criminal proceeding, but the right to privacy derived from our constitution remains a forceful protection against disclosure.
I recognize the privilege expressed in section 622.10 does not expressly apply to discovery disputes. Yet, the purpose and rationale of the statute unmistakably applies to pretrial discovery in a criminal case with the same vigor and importance as to the testimonial stage of trial. See Newman v. Blom, 249 Iowa 836, 844, 89 N.W.2d 349, 354-55 (1958) (recognizing medical records contain the same protected confidential information as a physician’s direct testimony about the communications). Discovery of witness records is a predicate step to trial testimony and is guarded by the same basic underlying considerations. Moreover, it is important to discuss the privilege in the context of the statute because the statute has been the forum largely responsible for the development of the law, even though the privilege also has its roots in the broad constitutional right to privacy. See McMaster, 509 N.W.2d at 758 (recognizing the roots of the right to privacy in mental health records). Nevertheless, our legislature has left discovery disputes over confidential records for the courts to resolve, and it is incumbent on courts to develop a workable standard and resolve each dispute. The statutory privilege is not a legal defense to a discovery dispute, but the rationale of the privilege provides an important perspective in gaining a full understanding of the privacy interest at stake.
The competing fundamental interest at stake in this case is derived from constitutional protections provided to an accused to confront witnesses in a criminal trial and to be given a fair trial. A defendant in a criminal case not only has a right to confront witnesses with effective cross-examination, but due process and the right to a fair trial also demand an accused be given a full and fair opportunity to present a claim of self-defense. See Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974) (recognizing defendant’s right to confront witnesses with adequate cross-examination); see also Chambers v. Mississippi, 410 U.S. 284, 297-98, 93 S.Ct. 1038, 1047, 35 L.Ed.2d 297, 310 (1973) (recognizing defendant’s right to due process includes the right to present a defense by cross-examining witnesses). Although a defendant’s constitutional right of confrontation is not limitless, a decision denying a defendant access to “ ‘a certain class of evidence, even for the purpose of preventing a witness from suffering embarrassment on the stand, should not limit the Sixth Amendment right of a defendant to confront the witness against him.’ ” State v. Howard, 121 N.H. 53, 426 A.2d 457, 460 (1981) (quoting State of New Hampshire’s appellate brief); see also Chambers, 410 U.S. at 295, 93 S.Ct. at 1046, 35 L.Ed.2d at 309 (“Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.”). Moreover, despite the power vested in state legislatures to protect the privacy rights of victims, “[c]riminal defendants have been guaranteed numerous rights by the fourth, fifth, and sixth amendments, and states may not infringe upon them regardless of general legislative power.” J. Alexander Tanford & Anthony J. Bocchino, Rape Victim Shield Laws and the Sixth Amendment, 128 U. Pa. L.Rev. 544, 554-55 (1980).
The clash between the two fundamental constitutional interests occurs in this case largely due to the presence of the self- *414 defense claim. Normally, mental health information of a victim is not admissible as character evidence in a criminal proceeding. See generally State v. Jacoby, 260 N.W.2d 828, 837 (Iowa 1977) (noting the general inadmissibility of evidence relating to homicide victim’s character). When the defense of self-defense is raised, however, evidence of a victim’s quarrelsome or violent disposition may become relevant to help establish the victim as the initial aggressor or the state of mind of the defendant. Dorè § 5.404:3, at 206-08. Such evidence of the victim’s character may be introduced through testimony concerning the victim’s reputation or by opinion testimony of a witness familiar with the victim. Iowa R. Evid. 5.405(a). It may also be shown by specific conduct. Iowa R. Evid. 5.405(6). In this case, Cashen asserts the mental health records of Doe are relevant to help formulate his self-defense claim through an expert witness and to impeach Doe on cross-examination in the event she is inconsistent or untruthful in her testimony on direct examination. There is also a suggestion that the records may help determine if Doe’s ability to accurately recall the incident is impaired. Cashen asserts his right to a fair trial demands discovery of the records.
In Heemstra, we developed a compelling-need test to resolve the clash between the competing interests of confidentiality and a fair trial in the context of a criminal prosecution.[5] 721 N.W.2d at 563. The test is based on the premise that a point exists when even the strong interest of confidentiality of mental health information must give way to a defendant’s right to confront witnesses and the right to present a defense in a criminal case. Id. at 562-63. In other words, this case involves a clash of two constitutional rights, and each case must be carefully examined to determine the point where one right must give way to the other. See Chidester v. Needles, 353 N.W.2d 849, 853 (Iowa 1984).
We relied on four factors in Heemstra in balancing the interests at stake to conclude limited disclosure of confidential mental health records was required in that case. First, disclosure was not only sought in the course of a criminal case, but the defendant faced the most severe penalty possible under the law. Heemstra, 721 N.W.2d at 563. This factor indicated the weight of the consequential harm of nondisclosure to the accused. Second, the person who was the subject of the medical records was deceased. Id. Although the physician-patient privilege continues after death, this factor tended to diminish the importance of protecting the records from disclosure because the fear of disclosure for a patient after death is not as compelling for the patient as the fear of disclosure before death. See McCormick § 102, at 462 (recognizing privilege continues af *415 ter the patient’s death); see also United States v. Hansen, 955 F.Supp. 1225, 1226 (D.Mont.1997) (“The holder of the privilege has little private interest in preventing disclosure, because he is dead.”). Third, some of the information subject to disclosure in the case had been voluntarily-placed in the public domain during the pendency of the case by virtue of a civil lawsuit filed by the executor of the victim’s estate. Heemstra, 721 N.W.2d at 563. This factor tended to diminish the need to protect the confidential interests of the particular patient. Finally, the nature of the confidential information was such that it could reasonably be viewed as an aid to the defendant in his self-defense claim. Id. This factor was considered to be the most important criteria in the ease because it not only placed the constitutional right to a fair trial into play, but it identified the specific need for the information and the particular prejudice that would be suffered by the accused without the information. See United States v. Alperin, 128 F.Supp.2d 1251, 1255 (N.D.Cal.2001) (recognizing records material to self-defense claim outweigh victim’s interest in confidentiality).
The factors we identified in Heemstra were not exhaustive, but instructive of the general approach courts should take in applying a balancing test in criminal cases. This test focuses on all the facts and circumstances of each case to fully assess a compelling need for the information. The burden to establish a need for the victim’s records is on the defendant. See McMaster, 509 N.W.2d at 759 (imposing burden on entity seeking the records). The relevant factors essentially allow the strength of the competing interests to be compared within the context of each individual case. This is the best method to achieve a just result.
The problem with the decision of the majority is the important case-specific balancing of the competing interests is discarded. As a clash between constitutional rights, this approach seems inconceivable. The majority claims to adhere to the balancing process through the use of protocol, but the protocol requires the disclosure of the confidential records based merely on a showing of relevancy. This new test does not consider any particular need for the victim to maintain privacy, nor does the test allow any particular circumstances of the defendant to be identified that may militate against full disclosure. More importantly, it fails to balance the competing interests by flushing out a compelling need for the confidential records. Instead, the new test presumes mere relevancy satisfies the compelling need and uses the protocol to realign the interests of the victim from preventing disclosure to minimizing disclosure. The right of the victim to keep records private from the court, defendant, attorneys, and various court and attorney employees is completely ignored.
In this case, the majority orders Doe to turn over all her medical and counseling records from the time she was a young teenager because Cashen has asserted a claim of self-defense and Doe has admitted she has a history of counseling that includes impulsive behavior and that she becomes frustrated easily due to posttrau-matic stress disorder. Absent from the analysis is any consideration that could diminish Cashen’s need for the confidential reports.
First, Doe is available to testify at trial, and she has already provided Cashen with an abundance of testimony under oath relevant to the claim of self-defense. Second, Cashen was married to Doe and likely possesses personal knowledge of the propensity and character of Doe to assist him in his claim of self-defense, including any *416 propensity for aggression or violence, based on his past relationship with her. Third, there was no proof by Cashen that relevant evidence of Doe’s character could not be obtained from other witnesses familiar with her background, disposition, and general reputation. Finally, although Cashen may utilize an expert witness to assist him to present his claim of self-defense, there was no proof that such assistance would not be available without additional medical records. Cashen has not argued, let alone established, his expert could not effectively present the desired opinion testimony about Doe’s character and propensities derived from her various medical diagnoses without first reviewing the medical records he seeks. Importantly, Cashen has failed to articulate specific grounds to explain how the records would aid in his self-defense claim in light of the evidence he possesses and the evidence available to him without the records.
Conversely, the public policy embedded in the battle against domestic abuse should heighten the need to protect the confidentiality of medical and counseling records of victims in domestic-abuse cases. While domestic abuse was rarely prosecuted as a crime in the not-too-distant past, it is now a common subject of civil and criminal enforcement in this state and nationwide.[6] Moreover, it is not uncommon for victims of domestic abuse to suffer from anxiety, depression, and posttraumatic stress disorder. Evan Stark, Re-Presenting Woman Battering: From Battered Women Syndrome to Coercive Control, 58 Albany L.Rev. 973, 997 (1995). Consequently, as the number of domestic-abuse prosecutions increases, so does the threat of disclosure of confidential records of prosecuting witnesses. Likewise, as the threat of disclosure of confidential records of victims increases, the public policy responsible for the greater reporting and prosecution of domestic abuse that is part of the overall effort to address domestic violence is likely to suffer. If victims of domestic violence must suffer the embarrassing and debilitating loss of their physician-patient privilege once they become a witness in a criminal domestic-abuse prosecution, a chilling effect will be cast over the reporting of domestic abuse, the disclosure of information to treatment providers by victims, the ability of physicians and psychotherapists to treat psychological disorders arising from domestic abuse, and the willingness of victims to testify against their abusers. The relevancy test of the majority fails to consider the impact of simple relevancy-based disclosure on society in general.
Finally, the holding of the majority deprives victims of domestic abuse crimes, and perhaps other victims of crimes, of a constitutional right of privacy without an opportunity to show how the deprivation of the right will impact their privacy interest. The victim is treated as if the right to privacy does not apply to judges, court staff, attorneys, defendants, and other people connected to the court system.
The majority has, without explanation, decided to paint with broad brushstrokes by making an implicit judgment that the *417 presence of potentially relevant records trumps confidentiality in the context of a criminal prosecution. Even though this judgment may be justified in many cases, it is not a justification to paint with a broad brush. Justice within a case involving strong competing constitutional interests requires a careful analysis of the particular facts and circumstances. Experience reveals that a one-size-fits-all test can present a serious risk of injustice in a particular case. This case may very well be one. Sadly, without an opportunity to fully explore all the compelling interests at stake, this will never be known.
The new test developed by the majority may be easy and beneficial to defendants, but it is a step back both for victims and for the progress made in addressing domestic violence over the last decade. The only way victims of domestic abuse with a history of counseling will be able to ensure the confidentiality of their private counseling records is to not report domestic abuse. The law should be able to do better.

. The American Medical Association (AMA) was the first national professional medical organization in the world. American Medical Association, History of AMA Ethics, http:// www.ama-assn.org/ama/pub/physician-resources/medical-ethics/ code-medical-ethics/history-ama-ethics.shtml (last visited June 22, 2010). The AMA promulgated the first code of ethics for physicians in 1847. Id. The current version of the ethical code still remains the authority governing physicians' conduct. Id. In its first version of the code, the AMA declared that the “obligation of secrecy” should be observed by all physicians. *412 See American Medical Association, Code of Medical Ethics of the American Medical Association ch. 1, art. I § 2, at 93 (1847), available at http://www.ama-assn.org/ama/upload/mm/ 369/1847code.pdf. The AMA also pointed out in this early ethics code, “[t]he force and necessity of this obligation [of confidentiality to patients] are indeed so great, that professional men have, under certain circumstances, been protected in their observance of secrecy, by courts of justice.” Id. Over 160 years later, this ethical rule of confidentiality still governs practicing physicians.

. For example, Cashen's access to the records obtained in this case would presumably violate Iowa Code section 228.2, as the disclosure of the records to Cashen’s private detective does not appear to qualify under any of the five listed exceptions stated in section 228.2(1). Furthermore, under this record, there is no evidence that the custodians of Doe’s medical records complied with the mandatory procedures associated with disclosure. See Iowa Code § 228.2(2).

. The seeds of this test were planted in Chidester v. Needles, 353 N.W.2d 849 (Iowa 1984), a contempt proceeding involving the issuance of a county attorney subpoena seeking medical records in the course of an investigation into suspected criminal activity. We recognized the issue involved a clash between the privacy interests of patients and the public interests in the fair administration of justice, and indicated the issue was resolved by balancing the two competing interests. Chides-ter, 353 N.W.2d at 853. We subsequently amplified this test in McMaster, where we imposed the burden on the entity seeking the confidential records to show the interests in disclosure were greater than the interests of confidentiality. 509 N.W.2d at 759. We also developed a five-factor test for an administrative agency to follow in attempting to satisfy the burden to obtain confidential records to investigate a complaint made to the agency. Id. at 759-60. Thus, the balancing test took root in the context of investigative proceedings and was adopted in Heemstra as the test in the context of criminal proceedings.

. Domestic violence is recognized almost universally as "an ever-widening epidemic” for which the legal system has continued to work towards a cure. See Betsy Tsai, Note, The Trend Towards Specialized Domestic Violence Courts: Improvements on an Effective Innovation, 68 Fordham L. Rev. 1285, 1287 (2000). While domestic abuse was generally socially and legally acceptable for centuries, the trend to end such violence has progressed substantially. In Iowa, statistics show that from 1990 to 1993, domestic abuse civil filings rose from 188 to 2677. Supreme Court Task Force on Courts’ and Communities' Response to Domestic Abuse, Final Report 6 (1994), available at http://www. iowacourts.gov/wfda-ta/frame9830-l 152/File9.pdf.