# IN THE COURT OF APPEALS OF IOWA

No. 21-1319
Filed August 30, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DAVID DWIGHT JACKSON,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Scott J. Beattie (motion to suppress) and David M. Porter (trial), Judges.

        The defendant appeals evidentiary rulings and the denial of his motion for a new trial. **AFFIRMED.**

        Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

        Considered by Bower, C.J., and Tabor and Greer, JJ.

**GREER, Judge.**

Following a fatal accident, David Jackson was convicted of vehicular homicide by operating while intoxicated (OWI), reckless driving, leaving the scene of an accident resulting in death, and operating a motor vehicle without the owner's consent. On appeal, he argues the district court should have suppressed the admission of a toxicology report obtained through the use of an inaccurate search warrant application. He also argues the district court erred in denying his motion for a new trial after allowing testimony regarding his medical records without a waiver of his physician-patient privilege. We affirm the district court's admission of the toxicology report; we also hold the district court did not err in allowing testimony about Jackson's medical records under Iowa Code section 622.10 (2020) or the rule against hearsay, so affirm the admission of that testimony.

**I. Facts and Prior Proceedings.**

On the evening of August 9, 2020, a Toyota Prius[1] was being driven southbound down a two-way, four-lane section of Martin Luther King Jr. Parkway (MLK) in Des Moines when the driver, later identified as Jackson, veered into the northbound lane. Eyewitnesses stated Jackson accelerated and crossed both northbound lanes before colliding with Bounleua Lovan, who was driving a Polaris Slingshot.[2] The Slingshot hit a telephone pole, and the Prius went over the street's curb, through a parking lot, and eventually crashed into a building.[3] One witness went to the car to offer assistance and noticed Jackson appeared dazed and

---

[1] It was later determined the Prius had been stolen, although not by Jackson.
[2] A Slingshot is a motorized vehicle with two front wheels and one back wheel.
[3] Lovan died from the injuries sustained.

confused as he got out of the driver's side door; Jackson then left the scene on foot. Police Officer Christopher Latcham was told Jackson's description and found him sitting at a nearby senior living facility; Jackson and Officer Latcham exchanged a few words before Jackson began to run away. Officer Latcham used pepper spray and eventually apprehended Jackson, who was then handcuffed by Officer Nathan Nemmers. Officer Nemmers testified that Jackson "had bloodshot, watery eyes, seemed a little paranoid, had some erratic behavior, [and was] sweating profusely," which indicated to him that Jackson was under the influence of either drugs or alcohol.

Jackson was transported to the hospital. Officer Nemmers later went there to conduct an OWI investigation. While he testified this would typically involve field sobriety tests (FSTs), he found Jackson was "incoherent and unable to follow, really, any commands or instructions. Just simply trying to talk to him before I could get to [FSTs], it was clear that he wasn't going to be able to perform the [FSTs] as requested." Officer Nemmers applied for a search warrant to collect a blood sample for testing. But he modified a previously used warrant application and did not delete the FST information already present on the computer form. The warrant was subsequently granted, and after running the testing, Jackson's blood sample came back positive for methamphetamine and amphetamines. The toxicology report showed the presence of methamphetamine at a level above the therapeutic dosage.

Jackson was charged with vehicular homicide by OWI, vehicular homicide by reckless driving, theft in the second degree, leaving the scene of an accident resulting in death, and operating a motor vehicle without the owner's consent.

Before trial, Jackson moved to suppress the admission of the toxicology report on his blood sample because of the defect in the warrant application. The district court denied the suppression motion.

At trial, Jackson's main defense was the accident occurred because he had a medical condition that caused him to pass out at the wheel. He testified about "black outs" he had before the accident and explained that, while driving down MLK, he "started to have, like, tightness in my chest, my breathing became restricted, and I passed out, blacked out at the wheel." Offering more details, Jackson went on to say he was admitted to the ICU, where "[his] heart rate had dropped, was at thirty-four" and care providers were concerned his "heart [might] stop again."

After Jackson testified about his medical condition, the State called Dale Peterson in rebuttal to testify about the details in Jackson's hospital records. Peterson was the health services administrator at Polk County Jail, and he oversaw all medical records for the jail. Jackson objected, arguing that testimony about his medical records was hearsay and protected by HIPAA[4] and he had not waived those protections. The district court allowed the evidence to be introduced at trial. Peterson testified that, after reviewing Jackson's medical records from the hospital, he believed Jackson's "vital signs were stable and within normal limits," including his blood-oxygen level. The jail medical staff was not alerted to Jackson having a history of blacking out. Upon his admission to the jail, Jackson was

---

[4] HIPAA is the commonly used acronym for the Health Insurance Portability and Accountability Act, Pub. L. 104–191, 101 Stat. 1936 (codified as amended in scattered sections of 42 U.S.C.),

placed on a detoxification program. But, on cross-examination, Peterson clarified that he had not read all of the records and he could not pinpoint the timing of the testing of Jackson's vitals.

The jury ultimately found Jackson guilty of vehicular homicide by OWI, reckless driving, leaving the scene of an accident resulting in death, and operating a motor vehicle without the owner's consent.

Before sentencing, Jackson moved for a new trial and in arrest of judgment. He again pointed to Peterson's testimony, arguing it contained information protected by HIPAA and Iowa Code section 622.10, which provides:

> A practicing attorney, counselor, physician, surgeon, physician assistant, advanced registered nurse practitioner, mental health professional, or the stenographer or confidential clerk of any such person, who obtains information by reason of the person's employment, or a member of the clergy shall not be allowed, in giving testimony, to disclose any confidential communication properly entrusted to the person in the person's professional capacity, and necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline.

The district court, in an oral ruling denying the motion, explained that in the cases Jackson pointed to dealing with section 622.10's protections, the disclosure occurred in the pretrial process. It stated

> From this Court's point of view, if Mr. Jackson noticed a witness who was going to testify about his condition, under the discovery rules, and particularly the reciprocal discovery agreement, that both parties signed on October 14, 2020, Mr. Jackson, as part of that discovery agreement, would have to turn over those records, because the State would then be entitled to the documents or records underlying that witness' testimony.
> What Mr. Jackson did here was not call a witness to testify about his medical condition. Mr. Jackson himself talked about his medical condition. He talked about his blood pressure. He talked about whether his heart was going to stop again. He talked about the drugs that were in his system, both on that day and the days and

weeks preceding that incident. He talked about the effects of the pepper spray. He talked about a whole host of issues regarding his condition on the day the event occurred.

Once he testifies about his condition, he absolutely opens the door for access to records that either support or refute that position. Effectively, what Mr. Jackson wants to do in Count II of the motion in arrest of judgment and motion for new trial is use chapter 622 both as a sword and a shield. He cannot do both.

Once Mr. Jackson talked about his condition, the State was entitled to produce evidence and obtain evidence that refuted that position. . . . Mr. Jackson was entitled to the protection of privilege, and because he opened the door for it, those records were fair game.

Jackson appeals.

## II. Analysis.

Jackson asks our court to grant him a new trial based on the admission of (1) the results of the toxicology report and (2) Peterson's testimony regarding Jackson's medical records.

### A. Toxicology Report.

Jackson argues the district court should have suppressed the results of the blood test obtained after the district court granted a search warrant application that contained inaccurate information.[5] The framework for Jackson's claim, known as a veracity claim, comes from *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); Iowa courts adopted the *Franks* standard in *State v. Groff*, 323 N.W.2d 204, 206–08 (Iowa 1982). Under the *Franks* standard, "a defendant [can] challenge the veracity of an affidavit by showing that the affiant: (1) intentionally and knowingly

---

[5] Our review focuses only on the FST information. On appeal, Jackson also argues the warrant application omitted material facts by noting his bloodshot eyes but not that he had been pepper sprayed. Because he did not make this argument to the district court, it is not preserved for our review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

made a false statement, or (2) made a false statement with reckless disregard for the truth." *Groff*, 323 N.W.2d at 207. As our supreme court explained this limitation,

> [t]he exclusionary rule "is not calculated to redress the injury to the privacy of the victim of the search and seizure." Rather, its purpose is to deter constitutionally violative police conduct. When a police officer through negligence or innocent mistake includes a false statement in a search warrant affidavit, little deterrent function is served by invalidating the warrant and suppressing the evidence.

*Id.* (internal citations omitted). "Allegations of negligence or mistake are insufficient to sustain an assault on the warrant." *State v. Niehaus*, 452 N.W.2d 184, 187 (Iowa 1990). We review the claim de novo. *Id.*

Jackson argues Officer Nemmers acted with a reckless disregard for the truth by "just kind of flippantly not going through his affidavit . . . . [N]ot proofreading that document [was] reckless." In the past, courts have found an affiant showed a reckless disregard for the truth when a defendant "show[ed] directly that the affiant had serious doubts as to the veracity of an informant's statement" or by showing "an inference 'from circumstances evincing "obvious reasons to doubt the veracity" of the allegations.'" *Id.*

Here, describing his actions as an "oversight," Officer Nemmers testified that he mistakenly left the FST information from a previously submitted application in the current warrant application because he did not proofread it. The district court, in ruling on Jackson's *Franks* challenge, described it as "a scrivener's error (albeit a significant one)." While we agree with Jackson that this was more than simply transposing numbers and we urge law enforcement officers to exercise greater care in preparing their search warrant applications, Jackson has not

established that the error was more than negligence or that Officer Nemmers engaged in some kind of intentional act when filling out the application. *See State v. Baker*, 925 N.W.2d 602, 614 (Iowa 2019) ("[The defendant] bears the burden of proving that officers made materially false statements in the affidavit either deliberately or with a reckless disregard for the truth."). And, as Officer Nemmers testified, the information presented on the warrant application, even without the mistaken FST detail, still supported a finding of probable cause. *See id.* at 616 (noting an officer is only required to present the information supporting a probable cause finding). Here, we conclude the grant of the warrant had a substantial basis under the totality of circumstances that were accurate in the warrant application. *See State v. Bracy*, 971 N.W.2d 563, 564 (Iowa 2022). Thus, on our de novo review, we affirm the district court's determination that this mistake did not meet the *Franks* test requirements and even if we excised the admittedly incorrect details, the other information in the affidavit supports a probable cause finding.

**B. Medical Record Testimony.**

Next, Jackson argues the district court erroneously allowed Peterson's[6] testimony about his medical information because it was both confidential and hearsay. "We review the trial court's interpretation of section 622.10 for errors of law." *State v. Deases*, 518 N.W.2d 784, 787 (Iowa 1994). We also "review rulings on hearsay for the correction of legal error." *State v. Veverka*, 938 N.W.2d 197, 202 (Iowa 2020).

---

[6] Neither party contests that Peterson was bound by the requirements of section 622.10.

*i. Physician-Patient Privilege.*

Jackson argues his medical records were protected by HIPAA and the testimony about the records was inadmissible because of Iowa Code section 622.10. If a state law provides less stringent protection than HIPAA, HIPAA supersedes and preempts that state law. 42 U.S.C. § 1320d–7(a)(1).

As our supreme court has discussed before:

> Under HIPAA regulations, a covered entity generally is not permitted to use or disclose protected health information. 45 C.F.R. § 164.502(a)(1)(i-ii). The federal rule is subject to several exceptions, including a broad exception for disclosures in judicial and administrative proceedings. 45 C.F.R. § 164.512(e). The judicial exception allows a covered entity to disclose any protected health information either in response to a court order or a subpoena. *Id.*

*In re A.M.*, 856 N.W.2d 365, 379 (Iowa 2014). Pointing specifically to Iowa Code section 622.10, the supreme court determined Iowa law was more protective than HIPAA. *Id.* So, we can limit our analysis to section 622.10.

*a. Error Preservation.* We begin with the State's argument that Jackson did not preserve error on his argument that the evidence was inadmissible because of section 622.10. Before Peterson testified, Jackson objected to the testimony outside of the presence of the jury; when asked by the district court to clarify exactly what the objections were, Jackson responded

> I would raise the HIPAA violation. I would also raise hearsay violation. I would also raise this is not the best evidence, and this is not the witness to attest to what exactly is in the Broadlawns medical records. We're lacking context.
> I also think that Mr. Peterson is not a competent witness to testify to the actions of a treating physician and what the—what's in those actual reports. That would—those would be the issues that I would raise.

In the motion in arrest of judgment and for a new trial, however, Jackson cited—for the first time—Iowa Code section 622.10. Generally a "[m]otion for a new trial ordinarily is not sufficient to preserve error where proper objections were not made at trial." *State v. Seltzer*, 288 N.W.2d 557, 559 (Iowa 1980); *see also Mitchell v. Cedar Rapids Cmty. Sch. Dist.*, 832 N.W.2d 689, 695 (Iowa 2013) ("It is well-settled that a party fails to preserve error on new arguments or theories raised for the first time in a posttrial motion."). But "error preservation does not turn on 'hypertechnical' challenges" or "on the thoroughness of counsel's research and briefing so long as the nature of the error has been timely brought to the attention of the district court." *Segura v. State*, 889 N.W.2d 215, 219 (Iowa 2017) (citations omitted); *Top of Iowa Co-op. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) ("[O]ne purpose of our error preservation rules is to ensure that the opposing party and the district court are alerted to an issue at a time when corrective action can be taken or another alternative pursued." (citation omitted)); *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005) ("[W]e recognize an exception to the general error-preservation rule when the record indicates that the grounds for a motion were obvious and understood by the trial court and counsel.").

And while Jackson recognized, during the hearing on the motion, that his section 622.10 claim is not synonymous with the HIPAA objection he actually made, the State agreed at that hearing that it "[thought] everybody in the courtroom understood what [Jackson] was saying when [he] raised the HIPAA objection, which I think has become kind of the colloquial way of claiming privilege in all medical matters. So I don't dispute that [he]—I believe that [he] properly raised the issue." Moreover, the district court's oral ruling on the motion referenced two

cases, both of which focused on section 622.10. Because Jackson raised the issue to the district court and it was ruled on, *see Meier*, 641 N.W.2d at 537, we find error was preserved and turn to the substantive argument.

*b. Section 622.10.* Arguing that a panel of this court decided a nearly-identical case in the defendant's favor, Jackson asks us to follow *State v. Roling*, Nos. 0-710, 99-1774, 2001 WL 98935 (Iowa Ct. App. Feb. 7, 2001) and remand for a new trial because of the trial court's error in admitting Peterson's testimony about Jackson's medical condition. To counter, the State notes that an unpublished opinion is not binding authority and urges that *Roling's* reasoning is not sound. *See* Iowa R. App. P. 6.904(2)(c). More pointedly, the State argues Jackson waived any privilege by raising his medical condition as a defense at trial. *See State v. Pepples*, 250 N.W.2d 390, 393–94 (Iowa 1977) ("The rule in Iowa is that when one party introduces inadmissible evidence, with or without objection, the trial court has discretion to allow the adversary to offer otherwise inadmissible evidence on the same subject when it is fairly responsive." (citation omitted)). So, first, we must address the application of the statute that governs medical information disclosure to see how it plays with the general rule of waiver. *Harder v. Anderson, Arnold, Dickey, Jensen, Gullickson & Sanger, L.L.P.*, 764 N.W.2d 534, 537 (Iowa 2009) ("Section 622.10 of the Code is the statutory rule for the testimonial aspect of the [physician-patient] privilege in a litigation setting.").

We first note that the legislature confirmed "the prohibition [in section 622.10(1)] does not apply to cases where the person in whose favor the prohibition is made waives the rights conferred . . . ." Iowa Code § 622.10(2). So, did Jackson waive his privilege to keep his medical information private and is the

district court correct that Jackson "opened the door" with his testimony about his health? *See Pepples*, 250 N.W.2d at 393–94 (noting that testimony solicited on direct examination can open the door to allow responsive inadmissible testimony).

Following Jackson's lead, we examine *Roling*. In *Roling*, the "[d]efendant was charged following a three-vehicle accident where the pickup he was driving crossed the centerline sideswiping a passenger car and forcing it off the road. The defendant next collided nearly head-on with a limousine." 2001 WL 98935, at *1. The defendant testified he had six to eight beers the night of the accident. *Id.* As a part of his defense, the "defendant testified he was seeking medical help for sleep apnea, and he was unaware of the condition before the accident." *Id.* at *3 (footnote omitted). At trial, the state sought to enter Roling's hospital records, which showed his blood alcohol content, "to impeach his testimony that he only had six or eight beers," and the district court admitted the medical records. *Id.* at *2. On appeal, the defendant argued the evidence violated Iowa Code section 622.10,[7] while the state maintained the defendant's testimony about his sleep-apnea treatment "opened the door to the evidence" and "privilege should be waived whenever a defendant puts his medical condition in issue as a defense to a charged crime." *Id.* at *3.

In *Roling*, our court concluded the district court erred in admitting the defendant's medical records. *Id.* at *4.[8] In doing so, we recognized that while "[t]he prohibition [against the admission of privileged information] does not

---

[7] While *Roling* utilized an older version of the Code, the relevant parts remain unchanged.

[8] Even though we concluded the court erred, the defendant failed to show he was prejudiced by the admission of the records, so we affirmed.

apply . . . in a *civil action* in which the condition of the person in whose favor the prohibition is made is an element or factor of the claim," there was no comparable language in the statute for criminal actions. *Id.* (citing Iowa Code § 622.10).

But we are not persuaded *Roling* controls our analysis here. First, unlike the situation here, in *Roling* the records were not sought to dispute a medical condition; the State sought their admission to bolster the State's proof of intoxication. We understand *Roling* to address a general "opening of the door" to seek admission of medical records for any purpose (i.e. disputing the level of sobriety), rather than a specific attack on a condition raised by the defendant as a defense (i.e. sleep apnea). In *Roling* the district court said the medical records "were admitted not to prove the defendant's blood alcohol was at a certain level, but rather because the medical records contained evidence differing from the defendant's testimony as to his sobriety," thus, the records were not used to rebut the sleep apnea claim but rather to impeach the defendant's testimony as to how many beers he consumed. *Id.* at *2. But here, the State sought admission of the medical records to directly dispute the medical condition Jackson maintained as a defense. And Jackson placed his condition at issue. *See* 1 Kenneth S. Broun et al., *McCormick on Evidence* § 103, at 384 (4th ed. 1992) (providing that policy considerations support a finding of waiver when the patient has voluntarily placed his condition in issue in a judicial proceeding); 8 J. Wigmore, *Evidence* § 2388, at 855 (1961) (providing that waiver may occur when the conduct places the claimant in such position, with reference to the evidence, that it would be unfair and inconsistent to permit retention of the privilege). And to the extent *Roling,* an unpublished case, conflicts with other legal authority, we are required to follow

published cases. *See* Iowa R. App. P. 6.904(2)(c) ("Unpublished opinions or decisions shall not constitute controlling legal authority."); *see also Webster v. State*, No. 17-0539, 2018 WL 3873411, at *2 n.4 (Iowa Ct. App. Aug. 15, 2018) (relying on Iowa Rule of Appellate Procedure 6.904 and concluding "a published opinion . . . is controlling legal authority"). In that vein, we find *Rieflin* more dispositive. *See State v. Rieflin*, 558 N.W.2d 149, 154 (Iowa 1996), *overruled on other grounds by State v. Lyman*, 776 N.W.2d 865 (Iowa 2010). Although *Rieflin* addressed the waiver of the physician-patient privilege when a defendant gives notice of the intent to rely on the defense of insanity or diminished responsibility, the reasoning is applicable here:

> We believe the defense of diminished capacity waived the privilege here, even if it had existed, for the simple reason *it would be incongruous to allow a party to put a matter in issue and then deny access of an opposing party to relevant information concerning it.* Our modern concept of criminal trials favors full disclosure of facts, within constitutional limitations, on both sides of the table . . . . Even the most restrictive authorities would say [defendant] would have waived the privilege by introducing evidence on it . . . .

*Id.* (alterations in original) (citation omitted).

We acknowledge that "[t]he rules of privilege . . . are not designed to facilitate the fact-finding process." *Chung v. Legacy Corp.*, 548 N.W.2d 147, 148 (Iowa 1996). "The physician-patient privilege is intended to promote free and full communication between a patient and his doctor so that the doctor will have the information necessary to competently diagnose and treat the patient," and "[w]e construe [section 622.10] liberally to carry out its manifest purpose." *Deases*, 518 N.W.2d at 787. But here, protecting the disclosure of his medical records was controlled by Jackson, who could have kept his medical condition out of the trial.

And, given Jackson's insertion of his medical condition into the trial during his direct examination, we agree with the district court and its interpretation that the privilege under section 622.10 was waived so that the State could directly rebut that medical claim. *See State v. Hardin*, 569 N.W.2d 517, 520 (Iowa Ct. App. 1997) (noting the privilege is not "designed as a shield" to conceal patient information); *but see State v. Leedom*, 938 N.W.2d 177, 189–90 (Iowa 2020) (noting medical details disclosed through cross-examination would not result in a waiver of the privilege). We find Peterson's testimony concerning the medical records that summarized the condition of Jackson was not barred by section 622.10.

*ii. Hearsay.*

We turn next to Jackson's argument that Peterson's testimony about statements contained in Jackson's medical records is hearsay. Hearsay is a statement "[t]he declarant does not make while testifying at the current trial or hearing" that is "offered into evidence to prove the truth of the matter asserted in the statement" and is typically not admissible. Iowa Rs. Evid. 5.801(c), .802.

Peterson testified that when an individual is taken to the hospital in between arrest and incarceration and then discharged from the hospital directly to the jail, the hospital will send the individual's medical records to the jail, which the jail keeps in the regular course of its business. When the individual arrives at the jail, jail personnel do their own medical intake, which includes taking vitals. Providing more detail, Peterson also testified that if "a patient states daily use or use of opioids or alcohol more than one to five days a week, [the jail] start[s] them on [an alcohol and opioid detoxification program]." Peterson also testified that, in his professional role, he was the custodian of those records. During his testimony

about Jackson's medical records, he explained that (1) Jackson's discharge documents showed no concerns about his breathing; (2) his medical records reflected his vitals were "stable and within normal limits"; (3) the records did not reflect that Jackson had a history of blacking out; (4) Jackson was initially admitted to the hospital for polysubstance use, rhabdomyolysis,[9] and a motor vehicle accident; and (5) at some point after the initial medical screening at the jail, Jackson was placed on a detoxification program. During cross-examination, Peterson clarified he had only looked at—and was only testifying about—Jackson's paperwork from when he discharged from the hospital, not the records for his whole stay at the hospital. He explained that discharge paperwork reflects "what [the defendant] [was] treated for at the hospital. It will also show follow-up appointments that are necessary. It will also show any current medications prescribed from that appointment." When asked, Peterson stated that the discharge paperwork did not show any vitals.

It is well established that hospital records are hearsay if offered to prove the truth of the matter asserted. *Madison v. Colby*, 348 N.W.2d 202, 204 (Iowa 1984). But, with the proper foundation, they can fall into one of the established exclusions from or exceptions to the rule against hearsay. *See State v. Buelow,* 951 N.W.2d 879, 884-85 (Iowa 2020). Here, the district court held the testimony was not hearsay because it was not offered for its truth but instead to show the jail's "subsequent course of conduct" for Jackson's treatment. In the alternative, the district court held the statements were admissible as describing Jackson's then-

---

[9] Peterson defined rhabdomyolysis as "damage of the muscular system typically during a state of dehydration."

existing mental, emotional, or physical condition. *See* Iowa R. Evid. 5.803(3). Jackson challenges both parts of the district court's hearsay ruling.

We agree with the district court that the evidence was not inadmissible hearsay, but for other reasons. *See State v. Smith*, 876 N.W.2d 180, 184 (Iowa 2016) ("[W]e recognize we may affirm a ruling on the admission of evidence by using a different rationale than relied on by the district court.") As for the district court's rulings, the jail's treatment of Jackson was not relevant to the case, which is best demonstrated by how the State went on to use the evidence during closing statements:

> [Jackson] tells you, "I didn't know I took meth." He tells you, "I had—when I was admitted to the hospital, I couldn't breathe. I had a heart rate of thirty-four," but Mr. Peterson had the records, the records that the defendant couldn't produce, wouldn't produce. Mr. Peterson had the records that said when he was admitted to the hospital, his oxygen level was 98[%].[10] When your oxygen level is almost perfect, you don't have a problem breathing. His vital signs were all stable and normal when he was admitted.
> He was admitted for polysubstance abuse. He was admitted for . . . his diagnosis for his dehydration. He was admitted for motor vehicle accident. Then, when he was admitted into the jail, by his self-report, he was put into a detox program, but he tells you all he wasn't under the influence of anything.

*Cf. McElroy v. State*, 637 N.W.2d 488, 502 (Iowa 2001) (noting even if hearsay evidence is admitted to show responsive conduct and not for its truth, "the court must limit its scope to that needed to achieve its purpose"). Looking next to the exception the district court cited, we are also unable to affirm on that ground because it only applies when the statement is about the declarant's then-existing

---

[10] This overstates Peterson's actual testimony—Peterson testified the defendant's oxygen level was 98%, but he never gave a time period for when that vital was taken so there was no evidence whether it was during Jackson's hospital stay or when his vitals were taken at the jail.

mental, emotional, or physical condition—but, while the statements objected to here are about Jackson's diagnosis and observed condition, Jackson is not the declarant, and so the exception cannot apply. *See* Iowa R. Evid. 5.803(3).

Still, "[w]e may affirm admission of evidence if it was properly admissible on any ground." *State v. Fontenot*, 958 N.W.2d 549, 556 (Iowa 2021). The records are admissible under rule 5.803(6), the business record exception, which allows:

> A record of an act, event, condition, opinion, or diagnosis if:
> (A) The record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) The record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) Making the record was a regular practice of that activity;
> (D) All these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with rule 5.902(11) or rule 5.902(12) or with a statute permitting certification; and
> (E) The opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

And here, Peterson testified that he is the custodian of the jail's medical records. He also testified that the medical records he reviewed were transmitted from the hospital to the jail at the time of Jackson's hospital discharge containing information about Jackson's condition at that time and the records from the initial medical screening conducted by jail staff at the time of Jackson's intake at the jail. According to Peterson's testimony, the records are kept as a part of the regular business of the jail and the record was made as a regular practice of the jail for those who need medical care after an arrest. With the appropriate foundation laid, the exception to hearsay found in rule 5.803(6) applies. *See State v. Musser,* 721 N.W.2d 734, 750-52 (Iowa 2006) (addressing the proper foundation to admit lab

reports under the business record exception). Because the evidence was properly admissible under this ground, we find no error.

**III. Conclusion.**

The district court correctly allowed the results of Jackson's toxicology report into evidence. And because Peterson's testimony about Jackson's medical records was not prohibited by Iowa Code section 622.10 once Jackson opened the door and was admissible as an exception to the rule against hearsay, we affirm the district court's admission of both.

**AFFIRMED.**